IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 20, 2002 Session

## SUE ANN BOWSER v. JOHN M. BOWSER

**Appeal from the Chancery Court for Maury County**
**No. 00-322    Jim T. Hamilton, Judge**

---

### No. M2001-01215-COA-R3-CV - Filed March 26, 2003

---

Prior to a determination on a complaint for divorce filed by Ms. Bowser, the trial court found the parties to be married pursuant to the common law of Ohio after their first divorce in that state in 1984. The trial court then classified and distributed the marital property and denied Ms. Bowser's request for rehabilitative or *in futuro* alimony. We affirm the decision of the trial court finding that a common law marriage existed, affirm the trial court's distribution of property, modify the alimony decision and remand the cause for further proceedings consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed as Modified and Remanded**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and HAMILTON V. GAYDEN, JR., SP. J., joined.

Virginia Lee Story, Franklin, Tennessee, for the appellant, Sue Ann Bowser.

James T. DuBois, D. Scott Porch, IV, Columbia, Tennessee, for the appellee, John M. Bowser.

### OPINION

This appeal arises from divorce proceedings in which the parties stipulated that Mr. Bowser had been guilty of inappropriate marital conduct. Ms. Bowser appeals the trial court's classification and distribution of property and the trial court's failure to award her spousal support. Mr. Bowser appeals the trial court's preliminary finding that the parties were married. We begin with that issue regarding the fundamental nature of the parties' relationship.

### I. Common Law Marriage

Sue Ann Bowser and John Michael Bowser were married in the state of Ohio, where they resided, in 1973. The parties were divorced by order of an Ohio court on July 12, 1984. Both Mr. and Ms. Bowser appeared in court on the day the decree was entered and both signed the decree.

Immediately after the divorce, Mr. Bowser spent about a month in Tennessee. Upon his return to London, Ohio, in August of 1984, Mr. Bowser began living with Ms. Bowser in what had been the marital residence. The parties continued to live together and moved to Tennessee in March of 1986, where they lived as husband and wife until they separated in 1999 after Ms. Bowser discovered Mr. Bowser was having an affair.

Ms. Bowser filed a complaint for divorce, and Mr. Bowser answered and denied that a valid marriage existed between the parties and asserted that, therefore, Ms. Bowser was not entitled to a divorce. The trial court bifurcated the proceedings and first held a hearing on the issue of whether a marriage existed. The court entered an order finding that the parties had been remarried pursuant to the common law of Ohio after their divorce in 1984.[1]

In Tennessee, marriage is statutory, and common law marriages between its citizens based on conduct in this State are not recognized. *Martin v. Coleman*, 19 S.W.3d 757, 760 (Tenn. 2000); *In Re Estate of Glover*, 882 S.W.2d 789, 791 (Tenn. Ct. App. 1994). However, Tennessee courts will recognize a valid common law marriage entered into under the laws of another state where such marriages are sanctioned. *Shelby County v. Williams*, 510 S.W.2d 73, 73-74 (Tenn. 1974); *In re Estate of Glover*, 882 S.W.2d at 791.

The question, therefore, is whether the parties were married under the common law of Ohio. Prior to 1991, the State of Ohio recognized common law marriage, which was defined as "the marital joinder of a man and a woman without the benefit of formal papers or procedures." *Nestor v. Nestor*, 472 N.E.2d 1091, 1094 (Ohio 1984).[2] However, such marriages, because they contravene public policy, were disfavored by the courts, and the burden of proving a common law marriage rested with the party claiming its existence. *In re Hammonds*, 315 N.E.2d 843, 847 (Ohio Ct. of Common Pleas 1973).

In *Nestor*, the Supreme Court of Ohio reiterated that there are three basic elements which must be shown in order to establish a common law marriage: (1) an agreement by competent parties to presently take each other as husband and wife; (2) open cohabitation following the contract; and (3) reputation in the community as being husband and wife. *Nestor*, 472 N.E.2d at 1095. The court explained each element more fully:

> The fundamental requirement to establish the existence of a common law marriage
> is a meeting of the minds between the parties who enter into a mutual contract to

---

[1] Ms. Bowser asserts the validity of the marriage is not an appealable issue because Mr. Bowser did not appeal within thirty days of the trial court's order deciding that issue. That order did not adjudicate all the claims between the parties and, therefore, was not a final order subject to appellate review absent certification under Tenn. R. Civ. P. 54 or the grant of permission for an interlocutory or extraordinary appeal under Tenn. R. App. P. 9 or 10.

[2] In 1991, Ohio enacted a statute which abolished any future common law marriages. Thus, *Nestor* was superceded by statute as stated in *Fitzgerald v. Mayfield*, No. CA516, 1991 Ohio App. LEXIS 5822 (Ohio Ct. App. Nov. 15, 1991), but the statute does not apply to common law marriages existing before its enactment.

presently take each other as man and wife. The agreement to marry *in praesenti* is the essential element of a common law marriage. Its absence precludes the establishment of such a relationship even though the parties live together and openly engage in cohabitation. Although cohabitation and reputation are necessary elements of a common law marriage, this court has previously held that standing alone they do not constitute a common law marriage.

The contract of marriage *in praesenti* may be proven either by way of direct evidence which establishes the agreement, or by way of proof of cohabitation, acts, declarations, and the conduct of the parties and their recognized status in the community in which they reside. However, all of the essential elements to a common law marriage must be established by clear and convincing evidence.

Where there is no direct proof in reference to the formation of the contract of marriage *in praesenti*, testimony regarding cohabitation and community reputation tends to raise an inference of the marriage. This inference is given more or less strength according to the circumstances of the particular case. The inference is generally strengthened with the lapse of time during which the parties are living together and cohabitating as man and wife.

Where there is direct evidence concerning the formation of the contract of marriage *in praesenti* and a finding by the court, as here, that such a contract exists, the evidence of long-time cohabitation and reputation of living together as man and wife should be given even greater weight to further strengthen the inference of marriage.

As to the element of cohabitation, there must be proof that the parties had sexual activity in the open manner of husband and wife in a marital state. Secret cohabitation with its attendant indusium of concealment concerning the sexual activity of the parties will not suffice as evidence of a valid common law marriage.

As to the element surrounding the reputation of the parties in the community as being man and wife, in order to establish a common law marriage it is not necessary that they disseminate information to all society generally, or to all of the community in which they reside. Rather, there must be a holding out to those with whom they normally come in contact. A common law marriage will not necessarily be defeated by the fact that all persons in the community within which the parties reside are not aware of the marital arrangement, nor by the fact that all persons with whom they normally come in contact are also unaware of the arrangement.

*Nestor*, 472 N.E.2d at 1094-95 (citations omitted).

The same day they appeared in court in 1984 for their divorce, Mr. Bowser came to Ms. Bowser's house and told her he had made a mistake and was unhappy. He went to Tennessee that

or the next day, but attempts to reconcile continued. Ms. Bowser later spent a week with Mr. Bowser in Tennessee, and the couple traveled to Florida together. After Mr. Bowser returned to Ohio and moved back into the marital home, approximately one month after the divorce hearing, the parties simply continued their lives and their relationship as they had been before the divorce. Everyone, including Mr. Bowser, testified that the relationship between the parties went back to the same as it had been before the parties' divorce and that this arrangement continued for over a year while the parties continued to reside in Ohio.

In late 1985, the parties decided to relocate to Tennessee because Mr. Bowser foresaw opportunities for his home-building business resulting from the announced new Saturn plant there. The parties made several trips to the Columbia area looking for property to build their home and to build other homes for sale. They met with a realtor who helped them in their search. The realtor sent letters to them in Ohio addressed to Mr. and Mrs. Bowser. Offers and contracts for the purchase of real estate were signed by Mr. and Mrs. Bowser; property was deeded to Mike Bowser and wife, Sue Bowser. Documents reflecting these transactions, dated September 11, 1985, October 7, 1985, and October 23, 1985, were introduced into the record.

As part of the parties' divorce, they had agreed to a property settlement which required Mr. Bowser to pay Ms. Bowser $50,000 and to transfer certain real property to her. He made a first payment of $25,000, but never paid the rest, and, after the couple reconciled, the money paid was used for family and household expenses. The real property was never transferred to Ms. Bowser and remained jointly held. Because of the reconciliation, Mr. Bowser never paid the child support that was part of the divorce decree.

Mr. Bowser's brief states that the parties moved to Tennessee in March of 1986. After deciding to move to Tennessee, the parties returned to Ohio on several occasions to sell their real property located there. General warranty deeds for these properties dated October 16, 1985, September 3, 1986, and November 20, 1987, were made part of the record. Again, these documents reflected that the parties were husband and wife.

It is undisputed that the parties have filed joint tax returns, as married persons, for a number of years. In his deposition and testimony at trial Mr. Bowser stated that in 1984 and 1985 the couple "more than likely" filed joint tax returns and that since the parties moved to Tennessee in 1985 or 1986 they had filed joint tax returns.

Although Mr. Bowser testified he never introduced Ms. Bowser as his wife and did not hold himself out as married to Sue Bowser, he also testified he did nothing to correct the many references to the parties as husband and wife, including those on legal documents and tax returns.

Ms. Bowser testified she believed the divorce was never final or effective, although she was not allowed to testify as to the basis for that belief. Essentially, she allowed Mr. Bowser to return to the marital home and to a relationship that was the same as before the divorce because he wanted

things back as they used to be and promised not to be unfaithful again.  They remained together, living and acting as husband and wife, for another sixteen years after their reconciliation.

There was testimony from the parties, members of their families, a longtime friend who lived in Ohio when the parties lived there, the Tennessee realtor who helped them find property when they moved, and others.  From all the evidence, the trial court concluded that Ms. Bowser had shown by clear and convincing evidence that the parties had cohabited in Ohio for more than a year after their divorce, that the parties' community reputation was as husband and wife in Ohio, and that the parties' acts and declarations while in Ohio supported a finding of common law marriage in Ohio.  Our review of the evidence supports those findings.  Further, there is clear and convincing evidence that the parties, through their acts and conduct, held themselves out as husband and wife.

Mr. Bowser testified he never agreed or promised to re-marry Ms. Bowser.  Of course, if she believed they had never been divorced, no such promise would have been expected.  It was her intent and understanding that when they resumed cohabitation they were married.  Thus, she had the present intent to be married and entered into the arrangement with that intent and understanding.  Although Mr. Bowser disputes his intent to "re-marry" Ms. Bowser, his actions and conduct at that point and in the future contradict any assertion he did not intend to be married to her.

Thus, applying the facts of this case to the Ohio Supreme Court's instruction regarding how the necessary contract may be proved, i.e., by inference which may be stronger or weaker depending upon the particular facts and is created by cohabitation and community reputation, we affirm the trial court's conclusion that Ms. Bowser had proved by clear and convincing evidence a present contract to marry at the time they resumed cohabitation.  While the existence of a valid contract between the parties had to be proved by conduct that occurred while the parties lived in Ohio, we find that the conduct of the parties in the sixteen years after they moved to Tennessee strengthened the inference of that contract.

Consequently, we affirm the trial court's determination that the parties were married in 1984 according to the common law of Ohio.

## II. Distribution of Property

The next issue in this appeal is the trial court's classification, valuation and distribution of the parties' real and personal property.  Ms. Bowser argues that the trial court erred by not awarding her all her separate property and also erred in failing to award her a greater share of the marital property.

Upon the dissolution of a marriage, courts are called upon to divide the assets the parties accumulated during the marriage.  Such decisions are very fact-specific, and many circumstances surrounding the property, the parties, and the marriage itself play a role.  The task involves several steps, the first being to determine whether an asset is subject to division at all.

## A. Wife's Separate Property

Tennessee, being a "dual property" state, recognizes two distinct classes of property: "marital property" and "separate property." *Batson v. Batson*, 769 S.W.2d 849, 856 (Tenn. Ct. App. 1988). The distinction is important because, in an action for divorce, only marital property is divided between the parties. Tenn. Code Ann. § 36-4-121(a)(1); *Brock v. Brock*, 941 S.W.2d 896, 900 (Tenn. Ct. App. 1996). Separate property is not part of the marital estate subject to division. *Cutsinger v. Cutsinger*, 917 S.W.2d 238, 241 (Tenn. Ct. App. 1995). Accordingly, when it comes to dividing a divorcing couple's property, the court should initially identify the separate property, if any, belonging to each party. *Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998).

The general rules for determining whether property is separate or marital are found in statute. Tenn. Code Ann. §§ 36-4-121(b)(1) & -121(b)(2). Of course, the courts must apply these rules to the specific facts of each case. In addition, conduct between the parties can affect the classification of the property, and certain conduct can create presumptions as to separate or joint ownership. *See*, *e.g.*, *Kincaid v. Kincaid*, 912 S.W.2d 140, 142 (Tenn. Ct. App. 1995); *McClellan v. McClellan*, 873 S.W.2d 350, 351 (Tenn. Ct. App. 1993); *Barnhill v. Barnhill*, 826 S.W.2d 443, 452 (Tenn. Ct. App. 1991); *Batson*, 769 S.W.2d at 858.

Therefore, the determination of whether property is jointly or separately held depends upon the circumstances. *Langford v. Langford*, 220 Tenn. 600, 421 S.W.2d 632, 634 (1967). Whether an asset is separate property or marital property is a question of fact. *Cutsinger*, 917 S.W.2d at 241; *Sherrill v. Sherrill*, 831 S.W.2d 293, 295 (Tenn. Ct. App. 1992). Thus, a trial court's classification decisions are entitled to great weight on appeal. *Wilson v. Moore*, 929 S.W.2d 367, 372 (Tenn. Ct. App. 1996). These decisions will be presumed to be correct unless the evidence preponderates otherwise, *Hardin v. Hardin*, 689 S.W.2d 152, 154 (Tenn. Ct. App. 1983), or unless they are based on an error of law. *Mahaffey v. Mahaffey*, 775 S.W.2d 618, 622 (Tenn. Ct. App. 1989).

Ms. Bowser asserts that the trial court incorrectly classified some items as marital property which were actually her separate property. At trial, Ms. Bowser testified that fifty items, listed on a schedule which was attached as Exhibit A to the court's order, were her separate property. The trial court specifically found "all items on this schedule, except for items 17 and 18, the Pecos Bill Disney collectible and the Slewfoot Sue Disney collectible, to be the separate property of the Plaintiff." Indeed, item 17 on the schedule was the Pecos Bill Disney collectible and item 18 was the Slewfoot Sue Disney collectible, which Ms. Bowser valued at $1,000 and $600 respectively.

After hearing both parties' motions to alter or amend, the trial court clarified its earlier order and awarded the two specified Disney collectibles to Ms. Bowser, stating the court had re-examined its notes and had intended to award these pieces to Ms. Bowser.

On appeal, Ms. Bowser's brief merely states that based on the evidence, Ms. Bowser should receive as her separate property the 50 separately listed items. She was awarded 48 of those items as separate property and the other 2 in the later order. In her table explaining the trial court's

distribution of property, Ms. Bowser lists $1,000 of the Disney collection as having been awarded to her. In her suggestion to this court of how the property should be divided, she appears to include in the marital property only that portion of the Disney collection awarded to Mr. Bowser. From this, we interpret Ms. Bowser's argument to be that the two collectibles awarded to her by the trial court's clarification should not be included in the marital estate.

The trial court's original order treated most[3] of the Disney collection as marital property, awarding $20,000 of it to Mr. Bowser and $1,000 worth to Ms. Bowser. The trial court's later order awarded the two collectibles which had been excluded from the list of Ms. Bowser's separate property to Ms. Bowser, but did not identify the two collectibles as either marital or separate. We interpret the two orders, however, as classifying the Pecos Bill and Slewfoot Sue pieces as marital property.

At trial, Ms. Bowser testified that although the collection had started out as hers, most of the collection had been bought by Mr. Bowser for himself. He was the one who was interested in the collection. She testified that the Pecos Bill and Slewfoot Sue figures had been bought by Mr. Bowser as gifts for her. Mr. Bowser testified that he bought each of those for his collection, that both were older pieces he had wanted to acquire, that Ms. Bowser was with him when he made the purchases, and that they were not gifts to Ms. Bowser.

Faced with this directly contradictory evidence, the trial court was free to accredit one party's testimony. Here, the trial court found the two pieces to be marital property, but awarded them to Ms. Bowser. The evidence does not preponderate against the trial court's classification of the pieces.

We also feel compelled to point out that reducing the marital estate by the value of the two figures ($1,600 according to Ms. Bowser; $1,000 according to the court), as Ms. Bowser insists should be done, would make an infinitesimal difference in the total amount, since the trial court valued the marital property at a little over $500,000. It would make no difference in the equities of the division.

### B. Distribution of the Marital Property

After classification of the parties' property as either marital or separate, the trial court is charged with equitably dividing, distributing, or assigning the marital property in "proportions as the court deems just." Tenn. Code Ann. § 36-4-121(a)(1). The court is to consider several factors in its distribution. Tenn. Code Ann. § 36-4-121(c) (listing the factors to be considered). The court may consider any other factors necessary in determining the equities between the parties, Tenn. Code Ann. § 36-4-121(c)(11), except that division of the marital property is to be made without regard to marital fault. Tenn. Code Ann. § 36-4-121(a)(1).

---

[3]At trial, Ms. Bowser only claimed three pieces in the collection as gifts to her. The third, Snow White and the Seven Dwarfs, which she valued at $1,000, was awarded to Ms. Bowser as her separate property, since it was not one of the two items on the list excluded by the court.

The court's distribution of property "is not achieved by a mechanical application of the statutory factors, but rather by considering and weighing the most relevant factors in light of the unique facts of the case." *Batson*, 769 S.W.2d at 859. An equitable distribution is not necessarily an equal one. *Word v. Word*, 937 S.W.2d 931, 933 (Tenn. Ct. App. 1996). Thus, a division is not rendered inequitable simply because it is not precisely equal, *Cohen v. Cohen*, 937 S.W.2d 823, 832 (Tenn. 1996); *Kinard v. Kinard*, 986 S.W.2d 220, 230 (Tenn. Ct. App. 1998). Similarly, equity does not require that each party receive a share of every piece of marital property. *King v. King*, 986 S.W.2d 216, 219 (Tenn. Ct. App. 1998); *Brown v. Brown*, 913 S.W.2d 163, 168 (Tenn. Ct. App. 1994).

The trial court's goal in a divorce case is to divide the marital property in an essentially equitable manner, and equity in such cases is dependent on the facts of each case. The fairness of a particular division of property between two divorcing parties is judged upon its final results. *Watters v. Watters*, 959 S.W.2d 585, 591 (Tenn. Ct. App. 1997). Because dividing a marital estate is a process guided by considering all relevant factors, including those listed in Tenn. Code Ann. § 36-4-121(c), in light of the facts of a particular case, a trial court has a great deal of discretion concerning the manner in which it divides marital property. *Smith v. Smith*, 984 S.W.2d 606, 609 (Tenn. Ct. App. 1997); *Wallace v. Wallace*, 733 S.W.2d 102, 106 (Tenn. Ct. App. 1987). Appellate courts ordinarily defer to the trial judge's decision unless it is inconsistent with the factors in Tenn. Code Ann. §36-4-121(c) or is not supported by a preponderance of the evidence. *Wilson*, 929 S.W.2d at 372; *Brown*, 913 S.W.2d at 168.

As part of its responsibility to divide the marital estate equitably, the trial court must determine the value of the property included. The value to be placed on an asset is a question of fact. *Kinard*, 986 S.W.2d at 231. The parties herein submitted pretrial stipulations of fact establishing an agreed-upon value for most assets.

In the case before us, the trial court first dealt with the personal property, valuing and then distributing it. The total of the values assigned by the court to the items included in its list of personal property is $279,872. The trial court then made awards of specific assets to each of the parties. The total of the values assigned to the awarded assets is $201,175. The difference between the two totals is explained by the fact that the court included a retirement account in its original listing of marital property, but did not award that asset to either party in its itemized distribution of personal property assets.[4]

The trial court totaled the values of the assets awarded to Ms. Bowser, arriving at $107,200, and stated that was 53.29% of the total personal property in the marital estate.[5] The court then made

[4]In addition, the court valued the Disney collection at $20,000 in its listing of assets in the marital estate, but valued the portion awarded to Mr. Bowser at $20,000 and the portion awarded to Ms. Bowser at $1,000. This small discrepancy does not affect the equity of the division. We merely point it out to clarify our numbers.

[5]The trial court obviously meant that it was 53.29% of the total personal property actually awarded.

awards of specific assets to Mr. Bowser, totaled the value of those awards at $93,975, and determined that amount to be 46.71% of the personal property estate.

In making the specific awards of personal property, the trial court awarded Ms. Bowser: the "Leann Cole" note ($20,000); clothing, jewelry, household goods and furnishings in the marital residence ($15,750); the 1999 Lexus ($26,950); one-half of the checking account (approximately $9,500);[6] the monetary equivalent to one-half of the business known as "John Bowser Homebuilder" ($34,000);[7] and the two Disney Collectibles ($1,000), as discussed above.

Out of the personal property, the trial court awarded Mr. Bowser: all items of personalty including clothing, jewelry, household goods and furnishings in his possession; all tools, equipment, inventory and accounts receivable pertaining to the business known as John Bowser Homebuilders, less the cash award to the Plaintiff ($34,000); the 1997 Chevy 3500 with utility, the 1992 Chevy 3500 dump truck and the 1997 Riviera automobiles ($30,475); one-half of the checking account (approximately $9,500); and the bulk of the Disney collectibles ($20,000).

The parties stipulated that their real property had a total value of $415,200 with an indebtedness of $187,700. After dividing the personal property, the trial court then ordered the parties' real property[8] to be sold at public auction with all proceeds to be applied to the marital debts, court costs, and attorney's fees of both parties. After the deductions specified, the court ordered that the remaining proceeds be divided between the parties in the same percentage as resulted from the distribution of personal property, with Ms. Bowser receiving 53.29% and Mr. Bowser receiving 46.71%. Some clarifications were later made, as more fully described below.

In addition to this general description of the property distribution, Mr. Bowser was awarded a Met Life cash value insurance policy as his separate property. The parties' retirement account, in Mr. Bowser's name only, valued at $79,697, was awarded to Ms. Bowser as alimony *in solido*. The trial court found that the parties had accumulated total assets in an approximate amount of $696,072 and indebtedness totaling $187,700 for a net worth of $508,372.

---

[6]Ms. Bowser claimed the value of the checking account to be $21,610 and Mr. Bowser claimed the account contained only $18,500. The trial court resolved this issue by assigning a value to the checking account of approximately $19,000 and ordering it to be divided equally between the parties.

[7]The court thus found the business was worth $68,000, and divided this amount between the parties. We note that in both her pretrial filing and in her tabulation filed pursuant to Tenn. Ct. App. R. 7, Ms. Boswer valued the business at $68,000.

[8]This included the marital home located at 112 Masters Lane, Columbia, Tennessee; the adjoining lot, being Lot 47 of the Stoneybrook Estates; Lot 10 of the Allan Allias Subdivision, which was where the business known as John Bowser Homebuilder was located; Lot 9 with improvements in the Forrest Hills Subdivision; and Lots 1, 2 and 3 of Picketts Pointe.

Ms. Bowser makes a general argument regarding the equity of the distribution of property, which we will discuss below. That discussion will be aided, however, by our first discussing a few specific findings or awards by the trial court and Ms. Bowser's objections thereto.

## (1)  The Leann Cole Note

Ms. Bowser alleges that the trial court erred in awarding, as part of her portion of the marital property, a $20,000 note representing a lien on a home built by Mr. Bowser for Ms. Bowser's daughter from a previous marriage, Leann Cole. Ms. Bowser argues that the note is not a real asset of the parties, as they never intended to collect on it and only placed the lien against the property in the event that her daughter and former son-in-law got a divorce. The trial court found the note which is secured by a deed of trust on Ms. Cole's residence to be "a 'real' note and that it was due and payable to the holder thereof" and awarded it to Ms. Bowser in her marital property. We find that the evidence does not preponderate against this finding of fact by the trial court. Of course Ms. Bowser's real complaint is that because she has no intention of collecting on the note, it has no real value and its face amount should not be credited to her as part of her share of the marital property. Whether or not she intends to collect, the note is an asset which was properly included in the marital estate and in Ms. Bowser's share of that estate.

## (2)  The Retirement Account

In the trial court both parties listed the retirement account, valued at $79,697, as marital property. Each party proposed that the trial court award the entirety of the account to him or her. In their Tenn. Ct. App. R. 7 tabulations, both parties also list the account as marital property. That classification is correct. Tenn. Code Ann. § 36-4-121(b)(1)(A) & (b)(1)(B).

The trial court specifically included this account in its listing of personal property in the marital estate. However, it did not award the account, or a portion thereof, to either or both parties in its distribution of marital property. Instead, the trial court awarded Ms. Bowser the parties' retirement account as alimony *in solido*. The failure of the court to distribute the funds in the account according to the principles set out above was, technically, error. However, it is clear that the court awarded the entirety of the account to Ms. Bowser based upon its balancing of the financial situations of both parties. We will not disturb that award, but correct the nomenclature to reflect its true character as an award of marital property.

We note, however, that the award of the retirement account to Ms. Bowser changes the percentages of the distribution. Including the retirement account in the distributed marital estate increases the total of their personal property to $280,872. Awarding the account to Ms. Bowser increases her total to $186,897. Mr. Bowser's total remains the same at $93,975. Therefore Ms. Bowser was awarded 66.5% of the marital personal property, or essentially two-thirds, and Mr. Bowser was awarded 33.5%, or essentially one-third. Overall equity of the distribution is the goal, and the precise percentages involved are not determinative. They are simply a sometimes helpful way to apply practical measurements to the goal.

### (3)  The Marital Residence

Ms. Bowser objects to the way the trial court dealt with the marital residence, valued at $180,000, and an adjoining lot, valued at $20,000.  The trial court, finding that the parties owned several tracts of real property, including the marital residence, with a total stipulated value of $415,200, and a total indebtedness of $187,700, ordered that all the real property be sold and the proceeds applied: (1) to the marital debt consisting of a line of credit and loan secured by a lot in Forest Hills subdivision; (2) all court costs and remaining balances toward attorney's fees of both parties; and (3) the remaining balance split between the wife, at 53.29% and the husband at 46.71%.

After motions to alter or amend, the trial court determined that the proceeds from the sale of the marital residence should not be used to satisfy the line of credit because it was "totally business related and beyond the control of the Plaintiff."  After the trial court's order on the motions to alter or amend, a number of other motions were filed regarding, among other things, disposition of proceeds from the sale of real estate, a stay of the order to sell the marital residence, contempt for not complying with the order, and attorney's fees.[9]  The issues raised in these numerous post-trial motions were dealt with in part in an Agreed Order.

In a later order, the trial court limited the documents to be included in the record as post judgment facts; clarified the award of a specific portion of the attorney's fees; denied Mr. Bowser's request for a protective order and a finding of contempt against Ms. Bowser; and made other rulings discussed later in this opinion.

The documents allowed in the record include a settlement statement showing the sale of six parcels of property for a total of $228,250, with deductions for expenses, taxes, and payoff of indebtedness, leaving a balance of $18,285.28 to be paid to the Bowsers.  The documents indicate that Mr. Bowser purchased five of the six parcels of property.  In addition to those six parcels, the parties agreed, as evidenced by an Agreed Order, to list the marital residence with a realtor before auctioning it.

Ms. Bowser asserts that the trial court erred in requiring that the marital residence be auctioned.  After the trial court's initial order, Ms. Bowser had asked for a stay of the sale of the residence.  However, Ms. Bowser signed an agreed order evidencing the parties' agreement that the residence would continue to be listed until a specified date and if no contract were executed by that date, the house was to be sold at auction.  Because Ms. Bowser agreed to the auction of the house, however reluctantly, she cannot complain of it on appeal.

In the agreed order, however, Ms. Bowser retained the right to contest the distribution of assets on appeal, and she has done so.  In her brief, Ms. Bowser suggests that the marital residence and adjoining lot, or the equity therein, should be awarded to her.

---

[9]Some of the fees were apparently related to proceedings requesting and opposing protective orders.

(4) Equitable Distribution

Ms. Bowser asserts that the award to her of 53.29% of the parties' property was inequitable because she is the economically disadvantaged spouse, is 58 years old with health problems, and has an 8th grade education and little employment history except with her husband's construction business, making her earning potential much less than her husband's. In addition, she asserts that her contributions to the marriage and to the parties' accumulation of assets, as well as the duration of the parties' marriage, weigh in favor of a greater share of property being awarded to her. She asks for an additional judgment in an amount determined by this court to be equitable.

The financial situation of the parties is also relevant to Ms. Bowser's request for alimony or spousal support, as many of the same factors are applicable in that consideration. In addition, the property a spouse receives as part of the distribution of the marital estate upon divorce is an important factor in determining the need for, nature, and amount of spousal support. It is one of the statutory factors which courts are to consider in making spousal support decisions. Tenn. Code Ann. § 36-5-101(d)(1)(H). Both property division and support awards can be used to address the needs of an economically disadvantaged spouse.

Our Supreme Court has explained the relationship between spousal support and the distribution of marital property when one spouse is economically disadvantaged.

> All relevant factors, including those set out in § 36-5-101(d)(1), must be considered on a case-by-case basis to determine the nature and extent of support. Tenn. Code Ann. § 36-5-101(d)(1). Factor (H) requires the trial court to consider the division of marital property when awarding alimony. Tenn. Code Ann. § 36-5-101(d)(1)(H). The division of marital property involves the distribution of both marital assets and marital debts. *See Anderton v. Anderton*, 988 S.W.2d 675, 679 (Tenn. Ct. App. 1998); *Mondelli v. Howard*, 780 S.W.2d 769, 773 (Tenn. Ct. App. 1989). We encourage trial courts to use the division of marital property to assist in meeting the disadvantaged spouse's financial needs when feasible. *See Crabtree*, 16 S.W.3d at 361 n.4 ("In cases in which there is a disparity between the relative earning capacities of the parties, a trial court also may consider adjusting the award of marital assets to assist the disadvantaged spouse."); *see also Renfro v. Renfro*, 848 P.2d 830, 834 (Alaska 1993) (establishing a preference for meeting the parties' needs with the division of marital property, rather than with alimony). Section 36-4-121 of the Tennessee Code Annotated does not require an equal division of marital property but an equitable division. Tenn. Code Ann. § 36-4-121(a)(1); *see Ellis v. Ellis*, 748 S.W.2d 424, 427 (Tenn. 1988). When practical, therefore, a trial court should consider awarding more assets to an economically disadvantaged spouse to provide future support, rather than relying solely upon an award of alimony. When there are few marital assets but a considerable amount of marital debt, a trial court should similarly consider awarding a disadvantaged spouse a lesser amount of marital debt. Careful distribution of the marital property may assist the disadvantaged spouse in

achieving rehabilitation in furtherance of the legislative policy of eliminating spousal dependency.

*Robertson v. Robertson*, 76 S.W.3d 337, 341 (Tenn. 2002).

Absent a showing by Ms. Bowser of greater need due to economic disadvantage, the trial court's distribution of property would appear equitable. Whether that distribution should be modified to meet Ms. Bowser's needs depends upon consideration of the factors and issues relevant to spousal support. Therefore, we must consider the issues surrounding Ms. Bowser's request for spousal support.

### III. Spousal Support

After dividing the parties' property, the trial court awarded Ms. Bowser the parties' retirement fund with a balance of approximately $79,697, as alimony *in solido*. As discussed above, that award is more accurately characterized as part of the distribution of marital property. The trial court's intent in that award was to assist Ms. Bowser financially, and the use of marital property to help meet the needs of an economically disadvantaged spouse is appropriate.

Ms. Bowser alleges that the trial court erred in failing to award her alimony *in futuro* or rehabilitative alimony.

Trial courts have broad discretion to determine whether spousal support is needed and, if so, its nature, amount and duration. *Burlew v. Burlew*, 40 S.W.3d 465, 470 (Tenn. 2001). Appellate courts are generally disinclined to second-guess a trial court's spousal support decision unless it is not supported by the evidence or is contrary to public policies reflected in applicable statutes. *Bogan v. Bogan*, 60 S.W.3d 721, 733 (Tenn. 2001); *Kinard*, 986 S.W.2d at 234; *Brown*, 913 S.W.2d at 169. Our role is to determine whether the award reflects a proper application of the relevant legal principles and that it is not clearly unreasonable. *Bogan*, 60 S.W.3d at 733. When the trial court has set forth its factual findings in the record, we will presume the correctness of those findings so long as the evidence does not preponderate against them. Tenn. R. App. P. 13(d); *Bogan*, 60 S.W.3d at 733; *Crabtree v. Crabtree*, 16 S.W.3d 356, 360 (Tenn. 2000).

Alimony or spousal support is authorized by statute, Tenn. Code Ann. § 36-5-101(a)(1), which gives courts discretion to order "suitable support and maintenance of either spouse by the other spouse . . . according to the nature of the case and the circumstances of the parties. . . ." There are no hard and fast rules for spousal support decisions, and such determinations require a "careful balancing" of the relevant factors. *Anderton*, 988 S.W.2d at 682-83. In determining whether to

award support and the nature, amount and length of such support, the court is to consider all relevant factors, including those enumerated in Tenn. Code Ann. § 36-5-101(d)(1).[10]

Initial decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case, and court must weigh and balance all relevant factors. *Robertson*, 76 S.W.3d at 338; *Watters*, 22 S.W.3d at 821. Among these factors, the two considered to be the most important are the disadvantaged spouse's need and the obligor spouse's ability to pay. *Robertson*, 76 S.W.3d at 342; *Bogan*, 60 S.W.3d at 730; *Manis v. Manis*, 49 S.W.3d 295, 304 (Tenn. Ct. App. 2001). Of these two factors, the disadvantaged spouse's need is the threshold consideration.

---

[10]The factors the court must consider in setting the alimony obligation are:

(A) The relative earning capacity, obligations, needs and financial resources of each party, including income from pension, profit sharing or retirement plans and all other sources;

(B) The relative education and training of each party, the ability and opportunity of each party to secure such education and training, and the necessity of a party to secure further education and training to improve such party's earning capacity to a reasonable level;

(C) The duration of the marriage;

(D) The age and mental condition of each party;

(E) The physical condition of each party, including, but not limited to, physical disability or incapacity due to a chronic debilitating disease;

(F) The extent to which it would be undesirable for a party to seek employment outside the home because such party will be custodian of a minor child of the marriage;

(G) The separate assets of each party, both real and personal, tangible and intangible;

(H) The provisions made with regard to the marital property as defined in § 36-4-121;

(I) The standard of living of the parties established during the marriage;

(J) The extent to which each party has made such tangible and intangible contributions to the marriage as monetary and homemaker contributions, and tangible and intangible contributions by a party to the education, training or increased earning power of the other party;

(K) The relative fault of the parties in cases where the court, in its discretion, deems it appropriate to do so; and

(L) Such other factors, including the tax consequences to each party, as are necessary to consider the equities between the parties.

Tenn. Code Ann. § 36-5-101(d)(1).

While there is no absolute formula for determining the amount of alimony, "the real need of the spouse seeking the support is the single most important factor. In addition to the need of the disadvantaged spouse, the courts most often consider the ability of the obligor spouse to provide support."

*Aaron v. Aaron*, 909 S.W.2d 408, 410 (Tenn. 1995) (quoting *Cranford v. Cranford*, 772 S.W.2d 48, 50) (Tenn. Ct. App. 1989)).

Among the statutory factors to be considered in deciding whether to award alimony are: the relative earning capacity, obligations, needs, and financial resources of each party; the relative education and training of each party; the ability and opportunity and necessity of each party to secure such education and training in order to improve such party's earning capacity to a reasonable level; and the assets of each party, whether they be separate assets or marital property awarded in the divorce. Tenn. Code Ann. § 36-5-101(d)(1). Relative economic disadvantage incorporates the principles of need and ability to pay.

Where such disadvantage exists, the legislature has expressed a preference for rehabilitative alimony over long-term, open-ended alimony *in futuro*. Tenn. Code Ann. § 36-5-101(d)(1); *Robertson*, 76 S.W.3d at 339-40; *Burlew*, 40 S.W.3d at 470; *Crabtree*, 16 S.W.3d at 358. The purpose of an award of rehabilitative alimony is to encourage divorced spouses to become self-sufficient. *Robertson,* 76 S.W.3d at 339-40; *Burlew*, 40 S.W.3d at 471, *Crabtree*, 16 S.W.3d at 360.

Rehabilitative alimony is appropriate where the spouse is economically disadvantaged, but where rehabilitation is possible by the grant of "rehabilitative, temporary support and maintenance." Tenn. Code Ann. § 36-5-101(d)(1). Our Supreme Court has discussed the purposes behind alimony, stating:

The prior concept of alimony as lifelong support enabling the disadvantaged spouse to maintain the standard of living established during the marriage has been superseded by the legislature's establishment of a preference for rehabilitative alimony. The parties' incomes and assets will not always be sufficient for them to achieve the same standard of living after divorce that they enjoyed during the marriage. However, rehabilitative alimony may assist the disadvantaged spouse in obtaining further education or training. It may also provide temporary income to support the disadvantaged spouse during the post-divorce economic adjustment.

*Robertson*, 76 S.W.3d at 340-41.

In determining whether a disadvantaged spouse can be rehabilitated with short-term support, the court is to consider "every relevant factor." *Id.* 76 S.W.3d at 340. Neither the standard of living the parties enjoyed during the marriage nor the income or earning potential of the other spouse can be used as the sole or determinative factor. *Id*.; *Crabtree*, 16 S.W.3d at 359.

Where, considering all the relevant factors, rehabilitation is not possible, the courts should not refrain from awarding long-term support when that support is appropriate under the statutory factors. *Robertson*, 76 S.W.3d at 341-42. The statutory preference for rehabilitative support does not entirely displace other forms of support. *Id.*; *Anderton*, 988 S.W.2d at 682. The support statute itself provides for the grant of an award of support on a long-term basis "where there is such relative economic disadvantage and rehabilitation is not feasible in consideration of all relevant factors." Tenn. Code Ann. § 36-5-101(d)(1). The purpose of alimony *in futuro* is to provide financial support to a spouse who cannot be rehabilitated. *Burlew*, 40 S.W.3d at 470-71.

In the present case, the trial court found that it was feasible for Ms. Bowser to be rehabilitated even though Ms. Bowser "at the time of the divorce trial was fifty-seven (57) years old and has only an 8th grade education" stating:

> This Court feels that the Plaintiff is capable of being rehabilitated despite her age and educational background. She has ample experience in the home construction business to be placed in home improvement and construction companies such as Home Depot or Lowes. These companies look favorably on employing persons with experience in home construction or improvement. The Court therefore finds that the Plaintiff is not a candidate for alimony in futuro and the award of alimony in solido is more appropriate.

> The Court in making a decision toward alimony is taking into consideration the facts that Plaintiff's earning capacity is substantially less than the Defendant's, the Defendant's contribution to the demise of the marriage based on his inappropriate marital conduct, the long duration of the parties and the standard of living enjoyed by the parties as well as the drug trafficking the parties admitted to participating in some years ago which enabled them to enjoy a higher standard of living and where most of the assets of the parties originated. The more important factor to the decision to award rehabilitative alimony or alimony in solido is the Plaintiff's need and the Defendant's ability to pay. Need and the ability to pay are the critical factors in setting the amount of an alimony award. *Smith v. Smith*, 912 S.W.2d 155, 159 (Tenn. Ct. App. 1995).

> The Court finds that with the Plaintiff's talent shown in her exhibit, she will be able to find employment. The Court does, however, award the Plaintiff the retirement plan of the parties with an approximate balance of Seventy-nine Thousand Six Hundred Ninety-seven ($79,697.00) Dollars as alimony *in solido*. With the award to her from the sale of their assets, along with her portion of the marital personal property and the retirement fund as alimony *in solido*, the Plaintiff will be able to live comfortably.

The trial court found that Ms. Bowser's earning capacity was substantially less than her husband's. We agree. She has limited education and has several health problems, including heart

problems, a thyroid condition and scoliosis.[11]  Combined with her age and her past work experience, which involved working in the parties' construction business for which she did not receive pay, these facts indicate little likelihood she could greatly increase her earning capacity through training. Mr. Bowser, on the other hand, testified at the trial that he was 51 years old and in "excellent" mental and physical health, aside from occasional back pain.  He retained the construction business, which will provide him with income, while Ms. Bowser must find employment elsewhere.  The tax returns in the record indicate income from the business of $58,000 in 1999, $38,000 in 1998, and $58,000 in 1997.

Ms. Bowser's Income and Expense statement reflects that she had no income.  During the pendency of the case, Ms. Bowser received *pendente lite* support, and had $3,219 in monthly expenses.  The trial court found that "the Plaintiff [Ms. Bowser] has sustained her needs since the parties' separation with the Defendant paying her Two Hundred Dollars ($200) per week plus her utility bills."  Ms. Bowser testified that she had barely sustained herself on this amount, and had to forego some things including some medication, necessary repairs and maintenance to her car and home appliances, clothes, and paying her medical and legal bills.  Her expense statement did not include an amount for rent or house payment.

Mr. Bowser's Income and Expense statement reflected that his monthly net business profits were $4,293 and that his net monthly income after taxes and deductions is $2,862.  He claimed monthly expenses of $2,799, leaving him only $63 a month after expenses.  In addition, he testified that several of his expenses such as the $236 per month in insurance and $167 per month in car expenses are at least in part written off at the end of the year as business expenses on his income taxes.  Importantly, Mr. Bowser did not dispute that he had been paying Ms. Bowser $200 per week in support since the parties separated in addition to paying all of the utilities for the marital residence. This amount was not included as an expense on his Income and Expense statement.

We note that neither party came out of the divorce with any debt.  Because of the way the trial court structured the distribution of property, all then existing debt was paid from the proceeds of the sale of the real property, and the parties' assets were awarded free of encumbrance.  Thus, their needs, or expenses, do not include loan payments.  Neither was awarded a residence, so housing costs are to be anticipated.

Suffice it to say that certain items of claimed expenses could be questioned for both parties. We note that Ms. Bowser's claimed monthly expenses exceed those of Mr. Bowser by approximately $420 per month, and her expenses do not include housing costs, which Mr. Bowser claims at $550. One area in which Ms. Bowser could be expected to have greater expense than Mr. Bowser is in medical care and medication.  She lists that cost at $250 more per month than Mr. Bowser claims.

If we accept Mr. Bowser's expenses as reasonable, and assume that it is reasonable to expect the parties to have roughly equivalent expenses, but allowing for Ms. Bowser's increased medical

---

[11]Mr. Bowser testified that he was aware that Ms. Bowser had these health problems.

costs, Ms. Bowser's monthly living expenses would amount to approximately $3,000. There is nothing in the record to indicate that Ms. Bowser could obtain employment which would in the immediate or near future provide her with that amount of take home pay each month. While Ms. Bowser was awarded over half of the marital property, none appears to be income producing. Thus, she would be required to deplete those assets, including the retirement account, in order to be self-sufficient.

We do not disagree with the trial court's assessment that its award to her of the retirement account will assist her in maintaining herself, but have concerns about her need to totally deplete that asset before retirement. Neither do we disagree that Ms. Bowser should be expected to maintain employment, but are unconvinced that she can in the near future earn enough to be self-sufficient without using her assets in their entirety in a short time.

Based upon all the relevant factors, including the economic factors outlined above, the duration of the marriage, the contributions of each to the marriage, and the age and health of each, we conclude that Ms. Bowser is entitled to rehabilitative alimony for support during the post-divorce economic adjustment with the goal of her reaching self-sufficiency, through employment, use or investment of assets, or other income, after that period of adjustment. Consequently, we hold that Ms. Bowser should be awarded rehabilitative alimony in the amount of $500 per month for five years, or sixty months, from the date of the divorce. Upon remand, the trial court shall determine an appropriate method for payment of those amounts which would have been paid during the pendency of this appeal.

We have considered a re-distribution of the marital property to effectuate the same result, but determined that the practicalities of implementing such an order, especially in view of the auctions which were to have taken place, militate against that course. We affirm the trial court's distribution of property.

## IV. The Accounting Evidence

Ms. Bowser also seeks to have this court remand the case to the trial court for a new trial to consider accounting evidence regarding the finances of Mr. Bowser's business. This issue requires a background explanation. In preparation for trial, Ms. Bowser hired an accountant to review various records of the construction business operated by Mr. Bowser. This fact was first brought out at trial in cross-examination of Ms. Bowser regarding her request that Mr. Bowser pay her attorney's fees and the bill offered in support of that request. The bill included an outside fee for David Mensel, an accountant, as well as attorney time spent with Mr. Mensel. Ms. Bowser stated Mr. Mensel would not be a witness in the case, and her attorney argued that the accountant's fees were litigation expenses incurred upon recommendation of counsel, whether they chose to use Mr. Mensel as a witness or not. Mr. Bowser's attorney argued the fees were not reasonable, stating, "he's not going to be a witness in this case. They spent a lot of money for nothing . . . ."

Ms. Bowser, in fact, did not call Mr. Mensel as a witness. Mr. Bowser presented the testimony of his accountant, Mr. Regeon, who testified he had prepared tax returns for Mr. Bowser's business and the statements of financial condition filed with the state contractor's licensing board for a number of years. Those documents were introduced into evidence.

The trial court ordered that each party be responsible for his or her own attorney's fees and directed that all costs and attorney's fees be paid from the proceeds of the sale of real property "with the exception of the fees due Mr. David Mensel, for which the Plaintiff will be solely responsible." In her motion to alter or amend, Ms. Bowser asserted the trial court's ruling with regard to the payment of Mr. Mensel's fee was unclear, ambiguous, and in need of clarification. This was the only mention in this motion of Mr. Mensel. The court found:

> The Court nor anyone else received any enlightenment from any of the work performed by Mr. David Mensel, CPA. Therefore, any charges submitted by him for payment should not be paid from the proceeds of the marital home.

After Ms. Bowser changed counsel, two motions for clarification and to consider post-judgment facts were filed, the second of which addressed the trial court's ruling on Mr. Mensel's fee. In part, the motion states:

> That after spending $5,000 in retainer and incurring another $9,700 in fees for Mr. Mensel, Plaintiff would submit that his report should be considered. That Plaintiff would respectfully request that the Report from Mr. Mensel be a part of the record and marked as an exhibit in this cause and his statement of fees introduced for consideration by the Court of Appeals.

The trial court denied this request "[b]ecause no proof was entered at trial regarding the findings of David Mensel, CPA, and because the Defendant [Mr. Bowser] was given no opportunity to cross-examine or depose Mr. Mensel. . . ."

On appeal, Ms. Bowser states that she asked the trial court to be allowed to supplement the record with the report of the forensic accountant she hired to review the books of John Bowser Homebuilder. Her brief then states:

> Ms. Bowser argued that her trial counsel should have introduced the report in support of her argument that Mr. Bowser's income was greater than he actually reported and to supply the court with expert proof regarding the value of the business. This case should be remanded so that Ms. Bowser can present proof as to Mr. Bowser's actual earnings and the value of the business.

The trial court quite correctly refused to supplement the record with a report that was not introduced at trial and, therefore, not part of the evidence considered by the court in reaching its decisions. The report was not a post-judgment fact; it was evidence not offered at trial.

-19-

It is not perfectly clear from the record that Ms. Bowser asked the trial court for a new trial and a new opportunity to present the accountant's report and testimony, as opposed to asking the court to reconsider its order on Mr. Mensel's fees. If she did not present this issue to the trial court, she cannot raise it for the first time on appeal. Generally, this court will not entertain an issue on appeal that was not raised in the court below. *Simpson v. Frontier Cmty. Credit Union*, 810 S.W.2d 147, 153 (Tenn. 1991) (citing *Lovell v. Metro. Gov't*, 696 S.W.2d 2 (Tenn. 1985)); *Davis v. Tennesseean*, 83 S.W.3d 125, 127 (Tenn. Ct. App. 2001); *Harlan v. Hardaway*, 796 S.W.2d 953, 957 (Tenn. Ct. App. 1990). Numerous Tennessee cases hold that an issue raised for the first time on appeal is waived. *See, e.g., Norton v. McCaskill*, 12 S.W.3d 789, 795 (Tenn. 2000); *Lawrence v. Stanford*, 655 S.W.2d 927, 929 (Tenn. 1983) (noting, "It has long been the general rule that questions not raised in the trial court will not be entertained on appeal . . . ."). An issue not presented to, decided, or dealt with by the trial court will not be considered by appellate courts. *In re Adoption of a Female Child*, 42 S.W.3d 26, 32 (Tenn. 2001); *Reid v. State*, 9 S.W.3d 788, 796 (Tenn. Ct. App. 1999).

Even if she did ask the trial court for a new trial and can raise the issue in this court, Ms. Bowser is not entitled to a new trial and a new determination of the value of the business on the basis of the report. With regard to granting a new trial under a Tenn. R. App. P. Rule 59.04 Motion to Alter or Amend Judgment:

> To justify a new trial for newly discovered evidence it must be shown that the new evidence was not known to the moving party prior to or during trial and that it could not have been known to him through exercise of reasonable diligence.
>
> Thus, an attorney has a duty to investigate prior to trial, *Tipton v. Smith*, 593 S.W.2d 298 (Tenn. App. 1979); *Brown v. University Nursing Home, Inc.*, 496 S.W.2d 503 (Tenn. App. 1972); *City of Knoxville v. Ryan*, 13 Tenn. App. 186 (1929); *Demonbreun v. Walker*, 63 Tenn. 199 (1874); *Tabler v. Connor*, 60 Tenn. 195 (1873), to call appropriate witnesses at trial, *Zirkle v. Stegall*, 163 Tenn. 323, 43 S.W.2d 192 (1931); *Wilson v. Nashville C. & St. L. Ry.*, 16 Tenn. App. 695, 65 S.W.2d 637 (1933); *Stafford v. Stafford*, 1 Tenn. App. 477 (1926); *Ware v. State*, 108 Tenn. 466, 67 S.W. 853 (1902), to fully examine all witnesses, *Noel v. McCrory*, 47 Tenn. 623 (1868); *Luna v. Edmiston*, 37 Tenn. 159 (1857); *Darnell v. McNichols*, 22 Tenn. App. 287, 122 S.W.2d 808 (1938), and to secure evidence of which counsel becomes aware at trial. *Bradshaw v. Holt*, 200 Tenn. 249, 292 S.W.2d 30 (1956); *Southwestern Transp. Co. v. Waters*, 168 Tenn. 596, 79 S.W.2d 1028 (1935); *Whitfield v. Loveless*, 1 Tenn. App. 377 (1925). The client is also under a duty to act with due diligence in securing evidence for trial. *Hayes v. Cheatham*, 74 Tenn. 1 (1880); *Harbour v. Rayburn*, 15 Tenn. 432 (1835); *Puckett v. Laster*, 56 Tenn. App. 66, 405 S.W.2d 35 (1965); *Spence v. Carne*, 40 Tenn. App. 580, 292 S.W.2d 438 (1954).

*Seay v. City of Knoxville*, 654 S.W.2d 397, 399 (Tenn. Ct. App. 1983) (some citations omitted).

Ms. Bowser admits in her brief that her attorney should have admitted the accounting evidence at trial. Upon obtaining new counsel after the trial, Ms. Bowser filed a Second Motion for Clarification and to Consider Post Judgment Facts and to Supplement the Record on Appeal, on May 24, 2001, stating that "Mr. Mensel completed an evaluation [of] the Bowser Construction business 'John Bowser Homebuilder' and was prepared to provide testimony regarding Mr. Bowser's real income." Consequently, the evidence she now seeks to have considered by this court on appeal was evidence that was available at trial, but according to the transcript of the proceedings, Ms. Bowser's counsel at that time chose not to use. Thus, this evidence is not "newly discovered evidence" as is required to warrant a new trial under Tenn. R. App. P. Rule 59.04.

## V. Attorney's Fees

Finally, Ms. Bowser asserts that the trial court should have ordered Mr. Bowser to pay her attorney's fees rather than directing that the fees be paid out of the proceeds of the sale of real property. She also asserts that the court's order that some of Mr. Bowser's attorney's fees from those proceeds resulted in her paying 46.71% of her husband's remaining fees.[12]

An award of attorney's fees in divorce cases is considered alimony or spousal support, generally characterized as alimony *in solido*. *Yount v. Yount*, 91 S.W.3d 777, 783 (Tenn. Ct. App. 2002); *Miller v. Miller*, 81 S.W.3d 771, 775 (Tenn. Ct. App. 2001); *Wilder v. Wilder*, 66 S.W.3d 892, 894 (Tenn. Ct. App. 2001); *Kinard*, 986 S.W.2d at 235-36; *Smith*, 984 S.W.2d at 610; *Long v. Long*, 957 S.W.2d 825, 829 (Tenn. Ct. App. 1997); *Herrera v. Herrera*, 944 S.W.2d 379, 390 (Tenn. Ct. App. 1996); *Smith v. Smith*, 912 S.W.2d 155, 161 (Tenn. Ct. App. 1995); *Storey v. Storey*, 835 S.W.2d 593, 597 (Tenn. Ct. App. 1992); *Cranford*, 772 S.W.2d at 52, *overruled on other grounds by Bogan*, 60 S.W.3d at 730; *Gilliam v. Gilliam*, 776 S.W.2d 81, 86 (Tenn. Ct. App. 1988).

Because attorney's fees are considered alimony or spousal support, an award of such fees is subject to the same factors that must be considered in the award of any other type of alimony. *Yount*, 91 S.W.3d at 783; *Lindsey v. Lindsey*, 976 S.W.2d 175, 181 (Tenn. Ct. App. 1997). Therefore, the statutory factors listed in Tenn. Code Ann. § 36-5-101(d)(1) are to be considered in a determination of whether to award attorney's fees. *Langschmidt v. Langschmidt*, 81 S.W.3d 741, 751 (Tenn. 2000); *Kincaid*, 912 S.W.2d at 144. There are no hard and fast rules for spousal support decisions, and such determinations require a "careful balancing" of the relevant factors. *Anderton*, 988 S.W.2d at 682-83. Initial decisions regarding the entitlement to spousal support, as well as the amount and duration of spousal support, hinge on the unique facts of each case and require a careful balancing of all relevant factors. *Robertson*, 76 S.W.3d at 338.

---

[12]She arrives at this conclusion in part because, she states, she purchased the marital residence at auction. That fact is not apparent from the record before us. It would make no difference in our analysis of the issue, however, because the trial court simply ordered that the fees be paid from the proceeds of the auction and did not order Ms. Bowser to purchase the house or to pay additional fees because of that purchase.

As with other forms of spousal support, the need of the spouse requesting the award of attorney's fees is the single most important factor. *Miller*, 81 S.W.3d at 775; *Watters*, 22 S.W.3d at 821. The obligor spouse's ability to pay is also an important consideration. *Miller*, 81 S.W.3d at 775; *Hazard v. Hazard*, 833 S.W.2d 911, 917 (Tenn. Ct. App. 1991). Courts have held that in determining whether to award attorney's fees as spousal support, the most important factors are the real need of the disadvantaged spouse, a demonstrated financial inability to obtain counsel, and the ability of the obligor spouse to pay. *Wilder*, 66 S.W.3d at 895; *Cranford*, 772 S.W.2d at 50. In a recent opinion, the Supreme Court stated that an award of attorney's fees "is conditioned upon a lack of resources to prosecute or defend a suit in good faith . . ." and that such an award is to ensure access to the courts. *Langschmidt*, 81 S.W.3d at 751 (quoting *Fox v. Fox*, 657 S.W.2d 747, 749 (Tenn. 1983)). Consequently, a spouse with adequate property and income is not entitled to an award of additional alimony to compensate for attorney's fees and expenses. *Lindsey*, 976 S.W.2d at 181; *Umstot v. Umstot*, 968 S.W.2d 819, 824 (Tenn. Ct. App. 1997); *Houghland v. Houghland*, 844 S.W.2d 619, 623-24 (Tenn. Ct. App. 1992); *Duncan v. Duncan*, 686 S.W.2d 568, 573 (Tenn. Ct. App. 1984).

The trial court herein gave a thorough and accurate statement of the applicable legal principles, citing many of the authorities set out herein. Applying those principles to the facts of this case, the court concluded:

> It is clear that [Ms. Bowser] has received a larger portion of the marital assets which are in the form of liquidated cash and has assumed no indebtedness. It is clear that [Ms. Bowser] shall receive a larger portion of the net proceeds from the sale of the parties' real property. Therefore, the Court finds that there is no reason why the parties should not be responsible for their respective attorney fees. . . .

Although stating that each party would be responsible for his or her attorney's fees, the court then directed that "any unpaid balances toward fees of both parties" would be deducted from the proceeds of the sale of the real property before distribution of the remainder to the parties.[13]

In a later order, the court clarified its order, stating all of Ms. Bowser's fees owed by her to her attorney were to be paid from the proceeds of the sale of the marital home and that only that portion of Mr. Bowser's attorney's fees that were still unpaid were to be deducted. The court specifically held that any attorney's fees already paid by Mr. Bowser were not to be reimbursed to him from the proceeds of the sale of the marital home. The trial court also ordered that all of Ms. Bowser's attorney's fees owed to her trial counsel, including that related to working with Mr. Mensel, were to be paid from joint funds.[14]

---

[13]The court specifically excluded fees due and payable to Mr. Mensel from this deduction and directed that those fees be paid solely by Ms. Bowser. Her filings indicate those fees total over $14,000.

[14]This ruling allowed fees for attorney time consulting with and reviewing and directing the work of the accountant, while leaving in place the order that none of the accountant's fees themselves be paid from the proceeds.

According to Ms. Bowser's attorney's affidavit she incurred $32,783.15, and had an outstanding balance of $26,810.65 in attorney's fees. In her brief, Ms. Bowser states her attorney's fees were $33,000. Mr. Bowser's attorney's affidavit stated that Mr. Bowser had unpaid legal fees in the amount of $2,276.20.

Although the court found that each party should be responsible for his or her own fees, the court did not order that each party's fees would be deducted from only that party's share of the proceeds. Because the remaining proceeds were to be divided 53.29% / 46.71% between the parties, the result of the order that the fees be deducted first was that each party paid a share of the other's fees.

This situation operated to Ms. Bowser's advantage because the total of her fees payable from the proceeds was significantly larger than the amount of Mr. Bowser's fees allowed by the court. Thus, while it could be accurately stated that as a result of the court's orders she paid 53% of Mr. Bowser's $2,276 in fees, it would also be accurate to state that Mr. Bowser paid 47% of the $32,700 she incurred in fees.[15]

An award of attorney's fees as alimony is considered to be within the sound discretion of the trial court, *Loyd v. Loyd*, 860 S.W.2d 409, 413 (Tenn. Ct. App. 1993); *Wallace*, 733 S.W.2d at 110-11, and such an award will not be reversed on appeal if the trial court acted within its discretion. *Yount*, 91 S.W.3d at 783; *Garfinkle v. Garfinkle*, 945 S.W.2d 744, 748 (Tenn. Ct. App. 1996); *Lyon v. Lyon*, 765 S.W.2d 759, 762-63 (Tenn. Ct. App. 1988). The Tennessee Supreme Court has made it clear that "[t]he allowance of attorney's fees is largely in the discretion of the trial court, and the appellate court will not interfere except upon a clear showing of abuse of that discretion." *Aaron*, 909 S.W.2d at 411 (citing S*torey*, 835 S.W.2d at 597 and *Crouch v. Crouch*, 53 Tenn. App. 594, 606, 385 S.W.2d 288, 293 (Tenn. Ct. App. 1964)).

> Under the abuse of discretion standard, a trial court's ruling "will be upheld so long as reasonable minds can disagree as to the propriety of the decision made." A trial court abuses its discretion only when it "applies an incorrect legal standard, or reaches a decision which is against logic or reasoning or that causes an injustice to the party complaining." The abuse of discretion standard does not permit the appellate court to substitute its judgment for that of the trial court.

*Eldridge v. Eldridge*, 42 S.W.3d 82, 85 (Tenn. 2001) (citations omitted).

The trial court herein acted within its discretion in its orders regarding attorney's fees. It applied the correct legal standard, reached a decision which is reasonable in light of the substantial

---

[15] It is not clear to us whether the entire $32,783.15 was to be deducted from the proceeds or only the $26,810.65 balance, or, even, some other final number. Nonetheless, the principle is the same: Mr. Bowser's share of the proceeds was reduced by a portion of Ms. Bowser's much more substantial fees.

fees involved and the parties' property, and we cannot find that any injustice was caused to Ms. Bowser. We affirm the trial court's decision regarding attorney's fees.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's determination that the parties were married in 1984 according to the common law of Ohio; affirm the trial court's distribution of marital and separate property; modify the trial court's order to award Ms. Bowser rehabilitative alimony in the amount of $500 per month for five years; affirm the trial court's decision refusing to supplement the record with a report that was not introduced at trial; and affirm the trial court's decision regarding attorney's fees. We remand for any further proceedings that may be necessary. Costs of the appeal are assessed equally between the appellant, Sue Ann Bowser and the appellee, John M. Bowser.

_____
PATRICIA J. COTTRELL, JUDGE